325 So.2d 921

In re Robert **HUNTER**

v.

**STATE of Alabama.**

**Ex parte Robert Hunter.**

**SC 1397.**

Supreme Court of Alabama.

Dec. 4, 1975.

Rehearing Denied Jan. 9, 1976.

William J. Baxley, Atty. Gen., Joseph G. L. Marston III, and Aubrey Ford, Jr., Asst. Attys. Gen., for the State, opposed.

BLOODWORTH, Justice.

This petition for writ of certiorari seeking review and reversal of a Court of Criminal Appeals' decision was granted and submitted after oral argument. The decision below affirmed petitioner's second degree murder conviction.

The basis for review is averred to be a "conflict" between that decision and this Court's decision in *Karr v. State,* 100 Ala. 4, 14 So. 851 (1893), inter alia. We agree and reverse and remand.

Petitioner was first convicted in 1967 of murder in the second degree. The cause was reversed and remanded by the Court of Criminal Appeals, *Hunter v. State,* 48 Ala.App. 232, 263 So.2d 690 (1972). Petitioner was again tried, resulting again in a conviction of second degree murder and again appealed, resulting in an affirmance by the Court of Criminal Appeals. The facts, as contained in the opinion of that court, are as follows:

"Mrs. Wanda Smith Tate, wife of the deceased, Gordon Smith, testified that the

Roderick Beddow, Jr., and James M. Fullan, Jr., Birmingham, for petitioner.

killing took place on March 19, 1967, around 9:30 p. m. She had just returned home from church when she was nearly forced off the road by an on-coming car which parked in front of her home as she drove into her carport. She immediately told her husband of the incident, and he drove their car down the driveway to where the other automobile was parked. Mrs. Tate was then telephoning her sister-in-law who lived across the street. She then went down the driveway on foot, heard a voice, not her husband's, cursing loudly, then heard one shot and ran to her wounded husband.

"Mrs. Tate said she observed a person at the scene whom she had never before seen and identified him as the appellant. She said he ran to his automobile, 'squeaked the tires and sped off.' Her brother-in-law, Joe Beasley, and a neighbor, Hubert Sims, were at the scene when she reached her husband.

"Dr. Joe W. O'Neal testified as to treating the deceased around 10:30 p. m. on the night in question. He testified that Mr. Smith died during the emergency treatment from a gunshot wound in the neck.

"Joe Beasley testified that his wife was the sister of the deceased and that he was an eyewitness to the shooting. His wife received a telephone call from the wife of the deceased and went outside. He then went out also and went down the driveway to the road where two cars were sitting side by side with a pickup truck parked to the rear of one. Hubert Sims was in the truck. Mr. Smith was standing beside the truck talking to Mr. Sims.

"The witness saw the appellant with a rifle in his hands approach the deceased. The witness said he told the appellant to put the gun up, and the appellant turned the gun on him saying, 'You stay out of this you son of a bitch.' He then observed Hunter walk up to the deceased, curse him and jab him three or four times with the rifle. He heard the deceased ask Hunter why he had followed his wife home, whereupon the appellant said he had not followed her, that he had come for the man across the street.

"The witness said Hunter then cursed Smith again saying, 'I think I'll just shoot you you smart son of a bitch,' whereupon he raised the rifle, aimed at Smith's neck and shot him. Hunter then turned, ran to his car and sped away.

"The witness did not hear Smith curse Hunter. He only heard one shot. His brother-in-law had a pistol in his hand when Hunter shot him with the rifle, but he did not see Smith raise the pistol at any time. The witness took the pistol to his home where he and his wife emptied the chambers. There were six chambers in the .38 caliber pistol, but only five cartridges and none had been fired. He put the pistol and cartridges in a sack, and his wife put them up. He did not tell the police about the pistol, nor give it to them.

"Mrs. Madge Smith Beasley, sister of the deceased, was an eyewitness and saw the appellant shoot her brother. She testified to substantially the same facts as her husband.

"Hubert Sims, a neighbor of the deceased, testified for the defense that as he was starting to work on the night in question, he stopped his pickup truck behind two cars which were blocking the road. Smith, the deceased, came back to his truck with what appeared to be a gun in his hand and said the man in the other car had followed his wife home and that, 'he might have to kill him, or was going to kill him, or something like that.' He did not remember the exact words Smith used.

"He said the appellant then got out of his car with a .22 caliber rifle in hand and came back to where Smith was standing by the truck. There was an exchange of words, Hunter struck the deceased a couple of times with the rifle. He did not hear the deceased ever curse the appellant, nor

did he see the deceased raise his pistol. He testified on cross examination that Hunter used words similar to the threat Joe Beasley testified that Hunter made to the deceased. The appellant then stepped back and shot Smith with the rifle. The witness only heard one shot fired.

"The appellant, Robert Lee Hunter, testified in his own behalf. He said he was parked just above the Smith's driveway waiting on a man who lived across the street, when the deceased pulled up in another car and accused the appellant of following his wife home. Hunter denied it and told him it was none of his business what he was doing there as it was a public street. Smith came around his car with a pistol, cursed Hunter, accusing him again of following his wife, and shot into his car.

"The pickup truck then arrived, and the testimony is substantially the same as already set out, except that the appellant claims Smith raised his pistol, thereby causing the appellant to fire his rifle in self-defense.

"The appellant went home, talked to his mother and a Mr. Gray and then drove to the Northport Police Station. His mother left the station in the car, at the request of the police, and returned with the rifle. Police officers searched the car at the station and were unable to find a bullet hole inside that night. The next morning, appellant's mother showed investigating officers a bullet hole in the car. She testified that she did not fire a shot into the car to make the hole. A ballistics expert identified the slug as a .38 caliber, but due to its condition, it was impossible to determine from which gun it was fired."

The opinion states that a threat was made to petitioner-defendant at his automobile and the record reflects that the following transpired, viz:

"He told me, he said, 'You-son-of-a-bitch you,' said 'you've been following

my wife and I'm going to kill you for it.' And he just pulled his pistol up there and shot into my car."

\*     \*.     \*     \*     \*     \*

"A. When I was getting out I heard the man that shot into my car tell the man in the truck that he—he made this statement: He said, 'That son-of-a-bitch has been following my wife.', and said, 'I'm going to kill him for it.'

"Q. And what, if anything, occurred then?

"A. Well, I walked back there. I wanted to find out what he shot into my car for."

\*     \*     \*     \*     \*     \*

"Q. Yes, sir, and then what happened?

"A. I looked back at Mr. Smith and he had the pistol in his right hand and he was raising it.

"Q. Yes, sir. Then what happened?

"A. And I hit him on the hand one time which he had the pistol in and he —with his left hand he shoved the end of the rifle barrel back.

"Q. What happened then? If anything.

"A. He kept raising his pistol so I stepped back.

"Q. Yes, sir. Then what, if anything happened?

"A. And I shot him."

■ We may look at the record for a complete understanding of the questions treated when there is no dispute thereon. *Life Insurance Co. v. Miller*, 292 Ala. 525, 296 So.2d 900 (1974); Vol. 4 *Alabama Digest*, Certiorari, ☞57.

Petitioner contends that, under these facts, the trial court erred to a reversal in refusing the following charge:

"Defendant's Requested Charge No. 22, I charge you, members of the jury, that while threats alone will not serve as a justification for homicide, if the jury believe from the evidence that the deceased, at the time of the homicide was manifesting an intention to carry such threats into execution, by a positive act then done, or, that from the acts of the deceased at the time of the homicide, it would have appeared to a reasonable mind, under the circumstances, that the deceased was attempting to execute the threats against the defendant, you may then consider the threats made by the deceased in justification of the homicide.

"REFUSED    Joseph    A.    Colquitt,
                                    JUDGE"

In affirming the conviction, the Court of Criminal Appeals concluded that the refusal to give Charge 22 was not error because: (1) it gave "undue emphasis" to that portion of the evidence regarding threats; (2) it was "not supported by the evidence;" (3) it was "misleading;" (4) it was "covered" by the court's oral charge and given Charge 28; and (5) this case is factually "distinguishable" from *Karr v. State,* supra, in which a similar charge was held to have been properly given on behalf of the state.

■  At the outset of this discussion, it may be well to state our well-established rule that the only *proper purpose* for which "threats" by a deceased may be offered, after some testimony has been presented to prove self-defense [*Jones v. State,* 181 Ala. 63, 61 So. 434 (1913); *McCaghren v. State,* 52 Ala.App. 509, 294 So.2d 756, *rev'd on other grounds,* 292 Ala. 378, 294 So.2d 766 (1974)], is to show whether the killing was justified because the accused was in apparent and immediate danger to life or grievous bodily harm. *Turner v. State,* 160 Ala. 40, 49 So. 828 (1909); *Beasley v. State,* 181 Ala. 28, 61 So. 259 (1913).

■  As to the conclusion that the refused charge gave "undue emphasis" ["prominence", Vol. 11A *Alabama Digest* Homicide, ☞300(6)], we cannot agree. The charge clearly states a proposition of law in the form of a requested charge, twice held to have been a correct statement of the law and to have been properly given for the state in *Karr v. State,* 100 Ala. 4, 14 So. 851 (1893); 106 Ala. 1, 17 So. 328 (1894). True, the *Karr* case, on its facts, is different from the case at bar, but both *Karr* and the present case involved the question of "prior threats" and their relevance with respect to a plea of self-defense. It would appear that the Court of Criminal Appeals has fallen into the error of attempting to "weigh" the evidence—in stating that other witnesses saw no overt act and heard no threat. The question is not what is their, or our, view of the evidence, but simply whether such evidence was presented. It was.

Nor can we agree with the Court of Criminal Appeals that the charge was not supported by the evidence, i.e., "abstract."

The facts in the instant case are somewhat similar to the facts in the hundred-year-old case of *Gilliam v. State,* 50 Ala. 145 (1874). There, the armed deceased went to the house of the defendant and began a conversation and searched, as if for something stolen, in the presence of defendant's family. Whereupon, he left but called defendant to come out and defendant armed himself and went out, when, being asked by defendant as to why he treated his family so, deceased replied, "Damn you, go to shooting," at this time handling his pistol. Defendant then slew him. The Court held certain instructions dealing with self-defense ought to have been given, reversing the judgment of conviction.

In the instant case, whether defendant acted prudently in taking his rifle and going up to deceased at the pickup is not decisive of his plea of self-defense. The jury might have found, if they believed his testimony, under proper instructions from

the court, that his conduct was free from design to harm deceased, and was only for the purpose of asking why deceased shot at him. To sum up on this point, in language paraphrased from *Gilliam,* supra, viz:

"The refusal of the charges may have impressed the jury with the belief that the defendant in going out [from his car] armed, forfeited any excuse for the killing, which the threatening attitude of the deceased would otherwise have given him."

The charge was clearly supported by the evidence.

■ The charge was not "misleading," having been held proper to give in *Karr* both times it was before this Court.

The Court of Criminal Appeals wrote that the court's oral charge and given Charge 28 "covered" this Charge 22. Neither does. There is no mention of "threats" in either charge.

Although this case may not be factually the same as *Karr,* we think that, under the facts of this case, the *Karr* charge should have been given. The defendant was entitled to have the jury charged on this aspect of his defense since a correct request in writing was made to the trial judge and was not "covered" by the oral charge or other given charges.

The judgment of the Court of Criminal Appeals is reversed.

Reversed and remanded.

HEFLIN, C. J., and MERRILL, MADDOX, FAULKNER, JONES and SHORES, JJ., concur.

ALMON and EMBRY, JJ., recused themselves.